UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. ___ |
| | § | |
| NINE FINANCIAL ACCOUNTS | § | |
| SIX REAL PROPERTIES, | § | |
| AND SIX VEHICLES, | § | |
| | § | |
| Defendants. | § | |

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE
IN REM AND NOTICE TO POTENTIAL CLAIMANTS**

The United States of America, Plaintiff, files this action for forfeiture in rem against the properties that are listed below (collectively referred to as the "Defendant Properties"). The United States alleges on information and belief as follows:

**NATURE OF THE ACTION**

1.      The United States seeks the forfeiture of the Defendant Properties because they constitute or were purchased with the proceeds of criminal activity, specifically fraud against the Federal Employee Compensation Act ("FECA") program, administered by the U.S. Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP"), and other federal programs; and because the Defendant Properties are property involved in money laundering, in order to conceal and disguise the proceeds, promote the carrying-on of an illegal fraud scheme, avoid reporting requirements and to engage in monetary transactions with more than $10,000.00 in proceeds.

2.     Specifically, the Defendant Properties are the proceeds of numerous federal criminal violations (the "Subject Offenses"), including but not limited to: Health Care Fraud, in violation of Title 18 United States Code Section 1347;   Mail Fraud, in violation of Title 18 United States Code Section 1341; Wire Fraud, in violation of Title 18 United States Code Section 1343; Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud, in violation of Title 18 United States Code Section 1349; False Statements Related to Health Care Matters, in violation of Title 18 United States Code Section 1035; Conspiracy to Commit an Offense Against the United States or to Defraud the United States, in violation of Title 18 United States Code Section 371; Payment or Receipt of Kickbacks in Connection With a Federal Health Care Program, in violation of Title 42 United States Code Section 1320a-7b(b). The Defendant Properties are also property "involved in" Money Laundering, in violation of Title 18 United States Code Sections 1956 and 1957.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355, 1391(b) and 1395.

## THE DEFENDANT PROPERTIES

5.      The Defendant Properties are the following Financial Accounts ("Defendant Financial Accounts"):

| | ACCOUNT HOLDER/ INSTRUMENT DESCRIPTION | REFERENCE NAME | FINANCIAL INSTITUTION | ACCOUNT NO. | APPROXIMATE AMOUNT SEIZED IN US $ |
|---|---|---|---|---|---|
| a. | Advance Pharmacy | BBT 1 | BB&T | x4717 | $386,110.38 |
| b. | TruCare Pharmacy | BBT 2 | BB&T | x7427 | $806,821.00 |
| c. | Shalondria Simpson | JPMC Simpson Personal Checking | JP Morgan Chase | x2204 | $15,196.24 |
| d. | Advance Pharmacy | JPMC 1 | JP Morgan Chase | x5623 | $398,337.31 |
| e. | TruCare Pharmacy | JPMC 2 | JP Morgan Chase | x2252 | $618,999.54 |
| f. | SRS Real Estate Investment | JPMC SRS Real Estate | JP Morgan Chase | x0729 | $22,026.23 |
| g. | Shalondria Simpson Revocable Trust | JPMC Simpson Trust 1 | JP Morgan Chase | x1962 | $1,697,013.49 |
| h. | Shalondria Simpson Revocable Trust | JPMC Simpson Trust 2 | JP Morgan Chase | x5077 | $231,827.75 |
| i. | Shalondria Simpson | C. Schwab | Charles Schwab | x3195 | $1,000,000.00 |

Real Properties ("Defendant Real Properties"):

| REAL PROPERTIES |
|---|
| 13405 Sunset Bay Ln Pearland TX 77584 |
| 1219 Oahu Dr Tiki Island, TX 77554 |
| 2331 Nashville Ave New Orleans, LA 70015 |
| 4028 Chatham Ln Houston, TX 77027 |
| 31 Riverstone Island Dr Sugarland TX 77479 |
| 5213 Lillian St Houston, TX 77007 |

and vehicles ("Defendant Vehicles"):

| | VEHICLE | VIN/Serial No. |
|---|---|---|
| a. | 2017 Blue Wave 2200 Pure Bay | Serial No. PWV13872F617 |
| b. | 2016 Jaguar | VIN SAJWA2GE1GMW02706 |
| c. | 2017 Land Rover | VIN SALGS2FK6HA369005 |
| d. | 2018 Tesla 4dr SUV | VIN 5YJXCBE25JF104983 |
| e. | 2021 Jeep Grand Cherokee | VIN 1C4RJFAG2MC753861 |
| f. | 2021 Mercedes G63 | VIN W1NYC7HJ4MX415540 |

## STATUTORY BASIS FOR FORFEITURE

6.     This is a civil action in rem brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C.] section 1956(c)(7) of this title), or a conspiracy to commit such offense."   Pursuant to 18 U.S.C. § 1956(c)(7)(F), "any act or activity constituting an offense involving a Federal health care offense" is a specified unlawful activity. A "Federal healthcare offense" is specifically defined in 18 U.S.C. § 24(a) to include violations of 18 U.S.C. § 1347 and 1349 (health care fraud and conspiracy to commit health care fraud), 18 U.S.C. § 371 (conspiracy to pay and receive health care kickbacks), and 42 U.S.C. § 1320a-7b(b) (paying and receiving health care kickbacks and bribes).

7.     This action is also brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 [of Title 18], or any property

4

traceable to such property." Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for a person to conduct or attempt to conduct a financial transaction with proceeds of a specified unlawful activity knowing that the transaction is designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. Under 18 U.S.C. § 1957, it is unlawful for a person to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that is derived from specified unlawful activity.

## SUMMARY

8.      Shalondria Simpson ("S. Simpson") is a pharmacist who owned and operated Advance Pharmacy ("Advance")  and Eclectic RX & Consulting, Inc. d/b/a  TruCare Pharmacy ("TruCare"). According to records from the Texas Secretary of State, Advance was formed in November 2013 and TruCare was formed in July 2015.

9.      AccuHealth refers to a group of medical clinics in the Dallas, Fort Worth, and Corpus Christi, Texas-areas.  AccuHealth is owned and operated by DOCTOR ONE, a medical doctor and close relative of S. Simpson.

10.      PHARMACIST ONE is a pharmacist and close friend of S. Simpson. PHARMACIST ONE was the business manager for Advance and TruCare.

11.      DOCTOR TWO is a medical doctor associated with CLINIC ONE which operates clinics in Louisiana, Florida, and other locations (but not Texas).  CLINIC ONE advertises specialization in treating patients dealing with Federal workers' compensation issues. DOCTOR THREE is a Houston-based physician who treats patients dealing with Federal workers' compensation issues.

12.     Advance and TruCare purported to provide medication to patients with Federal workers' compensation benefits("claimants"), through the Federal Employee Compensation Act ("FECA") program, administered by the U.S. Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP"), and other federal programs.  However, S. Simpson, DOCTOR ONE, PHARMACIST ONE, and others have committed the Subject Offenses through their ownership and operation of Advance, TruCare, and AccuHealth by: (a) submitting false claims to DOL-OWCP for high-reimbursing prescription medications allegedly provided to claimants being treated by DOCTOR ONE, DOCTOR TWO, DOCTOR THREE, and other providers when the medications were not, in fact, medications prescribed for the specific needs of a particular patient[1]; (b) using the U.S. mail system, FedEx, and UPS to auto-ship medications to claimants' residences, including items that were not prescribed by a physician, were not medically necessary, and were not wanted or used by claimants; and (c) routinely "testing" the payor systems to determine what drugs would bring the highest reimbursements and then submitting claims for those drugs regardless of individualized patient need.

13.     A review of billing data revealed that from approximately June 2015 through March 30, 2022, Advance billed DOL-OWCP over $155.8 million and was paid over $45 million for services and products allegedly provided to federal workers.  From April 2018 through March 30, 2022, TruCare billed DOL-OWCP over $18.7 million and was paid over $10.3 million for services and products allegedly provided to federal workers.  During that same time period, for services and products allegedly provided to just USPS employees, Advance and TruCare combined billed DOL-

---

[1]  This Complaint refers to "claimants" and "claimant cases."  A "claimant," as described is a federal worker claiming benefits through DOL-OWCP.  A "claimant case" refers to the federal worker's treatment for injuries suffered on a particular date.  A single claimant may have multiple claimant cases.

OWCP over $155 million and were paid over $49.4 million.   Advance and TruCare also billed DOL-OWCP for services purportedly provided to other federal employees.

14.     Analysis of financial records revealed that the proceeds from the Subject Offenses were used and continue to be used to fund S. Simpson and DOCTOR ONE's other business ventures, and to purchase luxury items and other valuable assets.

## FECA PROGRAM INFORMATION

15.     Title 18, United States Code, Section 24(b) defines a "health care benefit program" as any "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual," and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. The FECA program is a health care benefit program as defined in this section.

16.     The FECA program provides monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States Government, including USPS employees, for disability due to personal injury or disease sustained while in the performance of their official duty.  The FECA program is federally funded and is a "Federal health care program," as defined by 42 U.S.C. § 1320-7b(f).

17.     Claimants are entitled to receive, and FECA provides coverage for, medical services, appliances, or supplies that a qualified physician prescribes or recommends and that DOL-OWCP considers necessary to treat the work-related injury/disease.     Benefits are only available while the effects of a work-related injury/disease continue.

18.     All medical service providers are required to enroll with DOL-OWCP through a designated bill processing agent.  To enroll, a provider must complete and submit a "Provider Enrollment Form" in which the provider lists the practice/provider's name, physical address, e-

mail address, and bank account information where payments from DOL-OWCP can be deposited, among other things.  By completing and submitting the Provider Enrollment Form, the provider certifies that they satisfy all applicable Federal and State licensure and regulatory requirements. The provider is also required to notify DOL-OWCP immediately if any information provided to DOL-OWCP in the enrollment process changes.

19.     After enrollment, providers may submit claims for payment and request pre-authorization for certain services with a uniquely assigned provider identification number.  To receive reimbursement from DOL-OWCP for services rendered, providers must submit a "Health Insurance Claim Form."  DOL-OWCP payments are processed outside of Texas and claims electronically submitted to DOL-OWCP from Texas are done through the use of interstate wires.

20.     Based on FECA program regulations, by submitting a bill and/or accepting payment, the provider certifies that the service for which reimbursement is sought was performed as described, necessary, appropriate, and properly billed in accordance with accepted industry standards.  In addition, the provider certifies that they are in compliance with all applicable regulations concerning rendering treatment and/or the process for seeking reimbursement for medical services.

21.     The Longshore and Harbor Workers' Compensation Act is a federal law that provides for the payment of compensation, medical care, and vocational rehabilitation services to employees disabled from on-the-job injuries.  The Division of Federal Employees', Longshore and Harbor Workers' Compensation ("DFELHWC") administers FECA, among other programs, and is in part responsible for determining what medications related federal programs will pay for.

## CONDUCT GIVING RISE TO FORFEITURE

22.     The business relationships that Advance and TruCare have with other medical facilities that refer patients are indicative of fraud.  For example, DOCTOR ONE has directed health care providers at her clinics (AccuHealth) to direct prescriptions for medications with high reimbursements from DOL-OWCP to Advance and/or TruCare.  Those patients are prescribed the same medications—regardless of the patient's condition, diagnosis, time since original injury, or other factors—and that the medications are prescribed based on the reimbursement the medication will provide to S. Simpson.    These prescriptions are formulated contrary to the intended purpose of prescription medications, which are supposed to be prescribed for the specific needs of a specific patient with a specific condition, not based on reimbursement rate.  Advance and TruCare also submitted claims to DOL-OWCP for medications that were never provided to the patients, many of which reimbursed at several thousands of dollars.   These claims were submitted electronically through the use of interstate wires.

23.     For example, according to billing data from November 2018 to April 2020, approximately 73.76% of AccuHealth's USPS-employed patients (claimants) received medication dispensed from Advance/TruCare.  The data revealed that during that time period, Advance and TruCare submitted over $1.1 million in billing to DOL-OWCP for medications allegedly provided to AccuHealth claimants and were paid approximately $703,000 on those claims, which were for medications allegedly provided on 278 claimant cases.  Most of the billing was for high-cost topical ointments and patches.  According to the ECOMP[2] records of AccuHealth claimants, most

---

[2] ECOMP, or the DOL-OWCP Employees' Compensation Operations and Management Portal system, is an online records system used by the DOL that allows medical providers to upload medical reports, forms requesting authorization for medical care and treatment, and other records related to a specific injury for a specific claimant. Claimants and other stakeholders also have access to information contained in the ECOMP system.

files contained no discussion or objective rationale to support the prescriptions for these prescription drugs, and many of the prescriptions appear to have been prescribed without any treatment visit or examination.  In some instances, the prescriptions continued even when claimants had not been seen by the prescriber for over 18 months.

*Former Employee Interviews*

24.     Investigators interviewed Employee 1, a former AccuHealth employee, on April 8, 2021.  Employee 1 verified that DOCTOR ONE directed AccuHealth Dallas employees to send prescriptions for patients, who were claimants, to Advance and TruCare.    Employee 1 recalled S. Simpson came to AccuHealth Dallas and gave a presentation  on  Advance  and  TruCare pharmacies,  essentially  marketing  the  pharmacies  to employees of AccuHealth Dallas. Employee 1 said DOCTOR ONE told Employee 1 that DOCTOR ONE had no stake in any of S. Simpson's pharmacies.

25.     According to Employee 1, AccuHealth Dallas uses a "template" prescription for compound medications sent to Advance and TruCare, which upon information and belief, is a common practice at pharmacies fraudulently billing for compounded medications.    Employee 1 said the formulary changed frequently and the changes seemed to be based on whatever was being reimbursed by payors at the time.

26.     Investigators interviewed Employee 2, a former Advance employee, on May 26, 2021.  Employee 2 described instances when boxes of medications that had been sent to a claimant were returned to Advance, marked "return to sender" or "undeliverable."  Instead of reversing the charges, PHARMACIST ONE would direct Employee 2 to resend the box on the claimant's next refill date and rebill for the same medication.  Employee 2 also recalled that claimants called Advance and complained that they were receiving scar creams/patches when they did not have

10

scars.      According to Employee 2, whenever reimbursements went down, PHARMACIST ONE

researched to determine which drugs, utilizing their National Drug Codes ("NDC"),[3] had the

highest reimbursements, and those products were then substituted into the prescriptions.

27.      Investigators interviewed Employee 3, a former Advance employee, on October 7,

2021.   Employee 3 who had nineteen years of experience as a pharmacy technician and had

concerns after starting to work at Advance.   Employee 3 noticed that only four types of

prescriptions were sent to claimants from Advance: two types of patches, one cream, and one other

prescription that Employee 3 could not recall.

*Claimant Interviews*

28.      Claimant A.C. was interviewed on September 24, 2021.   A.C. said s/he has been

treated by DOCTOR THREE for longer than two years and uses Walgreens Pharmacy to get

her/his prescription medications.   A.C. said s/he began getting packages of medications from

Advance but does not recall how long s/he has been getting the medications.   A.C. said s/he did not

take any of the oral medications that came from Advance because s/he did not believe that

DOCTOR THREE prescribed the medications that Advance mailed her/him.   A.C. said s/he threw

away most of the medications s/he received in the mail because s/he did not want or need the

medications. Although A.C. does not suffer from heartburn, many of the bottles of medications

s/he received from Advance were for omeprazole-sodium bicarbonate, a medication commonly

used to treat heartburn.   A.C. said s/he does not take the medication as s/he does not need it, did not

request it, and did not want it.  AC said s/he did use some of the lidocaine lotion and the patches

---

[3] For billing purposes, medications are categorized through the NDC Directory, which contains
product listing data submitted for all finished drugs including prescription and over-the-counter
drugs, approved and unapproved drugs and repackaged and relabeled drugs.  NDC numbers
consist of 11 digits in a 5-4-2 format.

sent to her/him by Advance but said s/he received so much of the lidocaine lotion s/he could not possibly use all the medication.

29.     According to claims data, DOL-OWCP paid Advance approximately $956,675.08 for medications allegedly provided to patient A.C. between 2016 and June 2021, based on prescriptions allegedly ordered by DOCTOR THREE.  Investigators obtained A.C.'s patient record from DOCTOR THREE's office, which does not have any references to prescriptions or authorizations for the prescription medications allegedly provided to A.C. by Advance.  Nor are there any copies of prescriptions or letters of medical necessity for the medications in A.C.'s ECOMP file.

30.     Claimant T.J. was interviewed on September 26, 2021.  T.J. said s/he has been treated by DOCTOR THREE and uses CVS Pharmacy to obtain prescription medications.  T.J. said OFFICE MANAGER ONE, DOCTOR THREE's office manager, told her/him about Advance and arranged for medications to be mailed to T.J. from Advance.  T.J. received medicated patches, lotions, creams and "generic pills" from Advance.  T.J. was surprised when s/he received oral medications from Advance because s/he knew DOCTOR THREE had not prescribed the oral medications.  Although DOCTOR THREE did discuss medicated patches with T.J. and told OFFICE MANAGER ONE to "set [her/him] up with them," DOCTOR THREE never discussed the compound creams or lotions with T.J.

31.     T.J. reported receiving too many medications that s/he did not want or need from Advance and that Advance seemed to change the creams s/he was receiving almost every month. Advance was also inconsistent in shipping medications, as the medications did not come every month.  T.J. said someone from Advance would call and tell her/him the cream s/he was using was no longer available and they were going to send her/him a different cream.  At one point, T.J.

started receiving patches in the mail from Advance that came in Ziploc bags, which concerned T.J. and prompted her/him to call Advance.  In that call, T.J. spoke to a woman who identified herself as the owner and T.J. asked the woman if Advance was taking the patches out of a box and giving them to different customers.  The woman denied that Advance was dividing the patches among customers and said she would send T.J. additional patches, which T.J. received.

32.     T.J. said s/he had not received any medications from Advance in over three months and has gone for as many as seven months without receiving medications from Advance. However, billing data indicates that Advance billed for thousands of dollars of compound medications allegedly provided to T.J., starting in September 2016, continually through at least April 2021 (missing only four months).

33.     At one point T.J., who does suffer from heartburn, asked DOCTOR THREE for a prescription for medication to help with heartburn, which DOCTOR THREE refused because T.J. could treat her heartburn with over-the-counter medications.  Notwithstanding DOCTOR THREE's refusal to prescribe such medication, DOL-OWCP paid Advance over $55,000 for omeprazole-sodium bicarbonate, purportedly prescribed to T.J. by DOCTOR THREE.  Between September 2016 and July 2021, Advance was paid over $860,000 for medications allegedly provided to T.J. and allegedly authorized by DOCTOR THREE.

34.     Claimant R.J. was interviewed on October 1, 2021.  R.J. said s/he was treated at AccuHealth by DOCTOR ONE and a nurse practitioner, NURSE PRACTIONER ONE, and received two boxes filled with creams and pain patches from TruCare that s/he never used.  R.J. said every time s/he was seen at AccuHealth, NURSE PRACTIONER ONE tried to push refills on her/him, which R.J. repeatedly declined.  Notwithstanding R.J.'s refusal, TruCare continued to send medications to R.J.

13

*DOCTOR THREE and OFFICE MANAGER ONE*

35.     An analysis of billing data revealed that DOL-OWCP paid Advance and TruCare approximately $5.8 million dollars for prescriptions purportedly dispensed to 26 claimants based on prescriptions DOCTOR THREE issued.

36.     Additionally, DOCTOR THREE's former office manager, OFFICE MANAGER ONE, used DOCTOR THREE's signature stamp to approve prescriptions for claimants being treated by DOCTOR THREE. On August 9, 2021, investigators interviewed DOCTOR THREE, who said he did not authorize the prescriptions for the patients for which Advance and TruCare ultimately billed DOL- OWCP, nor did he authorize OFFICE MANAGER ONE to use his signature stamp.  OFFICE MANAGER ONE admitted that she ordered prescriptions for claimants through Advance and that Advance was the only pharmacy from which she ordered medications for claimants.  OFFICE MANAGER ONE said someone at Advance would fax prescriptions to her, already filled out, and she would "sign for them" to approve the prescriptions.  OFFICE MANAGER ONE denied receiving money from Advance or any other party in exchange for authorizing the prescriptions.  However, according to phone toll records, OFFICE MANAGER ONE was in contact with S. Simpson at least 307 times between June 1, 2016, and August 9, 2021.

## Analysis Conducted by USPS-OIG

37.     USPS-OIG investigators analyzed billing patterns for Advance and TruCare using DOL-OWCP reimbursements to Advance and TruCare for USPS claimants from January 1, 2018, through May 2021.  As described in the following paragraphs, the analysis identified multiple trends that are indicative of fraud.

*Amount of Collections from Banned NDCs*

38.     The analysis revealed that during the period reviewed, both Advance and TruCare billed for an unusually high number of NDCs that were ultimately banned for reimbursement by DOL-OWCP.     For the period reviewed, TruCare submitted claims for 434 different NDCs, resulting in a total reimbursement from DOL-OWCP in the amount of $6,826,420.43. Of those 434 NDCs, 105 were ultimately banned by DOL-OWCP, and the DOL-OWCP reimbursements resulting from those NDCs alone was $5,666,168.14, or 83% of its DOL-OWCP collections for USPS claimants.  During the same time, Advance billed for 248 different NDCs, resulting in a total reimbursement of $17,575,905.74.  Advance similarly billed for 105 different NDCs that were ultimately banned by DOL-OWCP, resulting in a reimbursement of $14,634,705.93, or 83.3% of total collections for USPS claimants.

*First-Day Billing Tests*

39.     The analysis revealed a pattern where, on the first day that Advance or TruCare submitted a claim to DOL-OWCP for any particular NDC, that claim was reversed as a "Point of Sale" error.  In some instances, billing in earnest would begin shortly thereafter; in other instances, no subsequent bills were ever submitted for the NDC.

40.     Specifically, of the 434 NDCs that TruCare billed, 179 were billed and reversed on the first day that those NDCs were billed to DOL-OWCP, resulting in a zero-net payment from DOL-OWCP on the first day of submission.  In other words, for approximately 41% of the drugs TruCare billed, it submitted a claim for that drug, waited for DOL-OWCP to reimburse that claim, and then later represented to DOL-OWCP that the claim was in error.  Further, of the 179 NDCs billed and reversed, 107 were never later submitted for a paid claim.  In other words, almost 25% of the drugs TruCare submitted through the DOL-OWCP system were backed out and never resubmitted.

41.     Similarly, of the 248 NDCs Advance billed DOL-OWCP, 125 were billed and reversed on the first day that those NDCs were submitted to DOL-OWCP, resulting in a zero-net payment from DOL-OWCP on the first day of submission.  In other words, for approximately 50% of the drugs Advance billed, it submitted a claim for that drug, waited for DOL-OWCP to reimburse that claim, and then later represented to DOL-OWCP that the claim was in error. Further, of 125 NDCs billed and reversed, 86 were never later submitted for a paid claim.  In other words, almost 35% of the drugs Advance submitted through the DOL-OWCP system were backed out and never resubmitted.

42.     This "test billing" demonstrates that TruCare and Advance were attempting to learn how much DOL- OWCP would reimburse on a given NDC, a figure that DOL-OWCP does not make available. This kind of test billing is indicative of fraud as it suggests that medication is identified and dispensed based on reimbursement rates rather than patient need pursuant to a legitimate prescriber-patient relationship.

*Coordination of First-Day Billing Tests*

43.     The analysis revealed there were multiples instances where one S. Simpson-owned pharmacy submitted a claim for an NDC for the first time and reversed it after DOL-OWCP reimbursed, and shortly thereafter, the other S. Simpson-owned entity began billing in earnest for that NDC.  For example, TruCare billed DOL-OWCP for a drug assigned NDC 70981-0601-01 for the first time on February 24, 2021, and then reversed payment.  The next day, Advance submitted claims for this NDC, resulting in a $394,951.87 payment from DOL-OWCP in a single day.  As another example, TruCare billed DOL-OWCP for a drug assigned NDC 7308-60904-98 for the first time on April 15, 2021, and then reversed payment.  Less than a week later, Advance submitted claims to DOL-OWCP for this NDC, resulting in a $325,004 payment from DOL-

16

OWCP in a single day.  For each of these two compounds, DOL canceled the NDCs on March 10, 2021, and April 28, 2021, respectively—within a month of Advance and TruCare's first claims.  In my training and experience, this is indicative of fraud because it suggests that medication is identified and dispensed based on reimbursement rates rather than patient need pursuant to a legitimate prescriber-patient relationship.

*Advance and TruCare's Use of Marketers*

44.     Financial analysis revealed that between December 2014 and November 2018, Advance paid individuals and entities—identified by investigators as marketers—based on open-source research, Secretary of State records, bank records, and information learned in other investigations.  According to records from BB&T, S. Simpson reported in September 2016 to BB&T that Advance was withdrawing cash from BB&T to pay marketers.   S. Simpson also told bank personnel that she was breaking up her cash transactions in order to avoid the bank's reporting requirements.   Financial analysis revealed that between July 2015 and March 2, 2021, S. Simpson withdrew approximately $1,073,196.06 in cash from the business operating accounts of Advance and TruCare.   Based on my training and experience, cash withdrawals to pay marketers, especially in conjunction with the attempt to avoid bank reporting requirements, is indicative of illegal kickback relationships between S. Simpson and marketers.

*Kickback/Business Agreement with* S. Simpson *and* DOCTOR ONE

45.     Emails between S. Simpson and DOCTOR ONE demonstrate a kickback arrangement between the two. For example, in one email exchange, in November 2019, between S. Simpson and DOCTOR ONE, DOCTOR ONE writes to S. Simpson that she wants to know how much money is coming in on S. Simpson's end, and that S. Simpson has more prescriptions going to her now than she would without her **(**DOCTOR ONE**)**:

17

46.     Specifically, on or about November 12, 2019, DOCTOR ONE sent an email to SIMPSON with the subject line "One other thing," including a message about prescription referrals from Accuhealth to TruCare and Advance, including: "I would like to see each month how much money is coming in on your end from the scripts we write.   Let's face it, the amount may not be what you thought it was going to be when you bought the clinic, but it's more than what you would have coming in otherwise."   On or about November 13, 2019, SIMPSON responded via email: "The agreement we made before I bought the clinic was that all prescriptions would be coming to my pharmacy.   Otherwise I would not have bought Accuheatlh [sic] for 2.5 million dollars."

*Kickback/Business Agreement with* S. Simpson *and* CLINIC ONE

47.     Advance's financial records demonstrate the kickback arrangement between S. Simpson and the owner of CLINIC ONE.   Despite being located in different states, DOL-OWCP paid Advance approximately $27 million based on prescriptions purportedly authorized by prescribers at CLINIC ONE between 2016 and 2022.   Starting in 2016, and continuing through at least 2021, S. Simpson used Advance's BB&T operating account to pay CLINIC ONE's owner, often through shell companies.   For example, from in or around September 2016, through in or around November 2016, S. Simpson paid approximately $167,000 to an account controlled by a close family member of CLINIC ONE's owner.   Much of that money was then transferred for the benefit of CLINIC ONE's owner.   And from in or around October 2016, to in or around July 2021, S. Simpson paid approximately $1.85 million to an account controlled by an accountant hired by CLINIC ONE's owner.   Much of that money was then transferred for the benefit of CLINIC ONE's owner.

## THE MONEY LAUNDERING SCHEME

48.     In addition to perpetrating the underlying fraud and kickback scheme described above, S. Simpson and DOCTOR ONE also committed money laundering through the movement of criminal proceeds as part of a "layering scheme" to conceal or disguise the true nature and source of the proceeds.

49.     The proceeds were then used to purchase multiple luxury houses, vehicles, watercrafts, jewelry, and vacations; to set up additional businesses such as AirBnB rentals, the TruEssence Medical and Cosmetic Spa, and a medical marijuana operation; and to fund a lavish lifestyle that included travel to places like Dubai, Las Vegas and luxury resorts. Specifically, S. Simpson utilized a web of financial accounts and related business entities to provide a veneer of legitimacy to the fraud and money laundering schemes in order to conceal the true nature, source, and ownership of the criminal proceeds.

50.     As an example, in September 2016, S. Simpson reported to BB&T representatives that Advance was withdrawing cash from BB&T bank to pay marketers.   S. Simpson advised bank personnel the reason she was breaking up her cash transactions was so she could pay marketers that would only accept cash as payment.   Financial analysis revealed that between July 2015 and March 2, 2021, Simpson withdrew approximately $1,073,196.06 in cash from the business operating accounts of Advance and TruCare. This use of cash withdrawals was undertaken in an attempt to conceal the nature, ownership and source of proceeds, avoid reporting requirements, and avoid detection by law enforcement.

51.     A review of financial records also indicated that S. Simpson utilized "counter checks" to withdraw and conceal cash as part of the money laundering scheme.   Between July 2015 and March 31, 2022, S. Simpson withdrew 130 total counter checks totaling $1,125,741.46.

17 of these counter checks were redeposited into accounts held by S. Simpson totaling $100,100.00. 112 of the counter checks totaling approximately $939,039.46 have not been matched to known deposits. It is a common money laundering scheme for counter checks to be utilized as an alternative method to cash, and to launder or conceal currency, as it is easier to conceal counter checks in various amounts than it is to carry around large amounts of paper currency.

52.     This use of cash transactions to avoid reporting requirements, and the use of counter checks, strongly indicate that the S. Simpson was attempting to conceal the nature and source of her funds, specifically that the funds actually constituted fraud and kickback proceeds. This was buttressed by the use of business accounts that provided a veneer of legitimacy to the fraud scheme.

53.     S. Simpson also utilized proceeds from her fraud scheme to pay expenses associated with her businesses, invest in spin-off businesses, and further perpetuate her fraud scheme. In doing so, she violated numerous money laundering statutes including: 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii) and 1957.

54.     Between June 2015 and July 31, 2022, Advance and TruCare received a total of approximately $53,840,532.28 ("proceeds") from DOL-OWCP for the reimbursement of pharmaceutical services (i.e. purportedly dispensed compound medications) via deposits into: (1) BB&T (Truist) bank account ending in 4717, which is held in the name of Advance Pharmacy LLC Operating Account; (2) BB&T (Truist) bank account ending in 7427, which is held in the name of Eclectic RX Consulting Inc DBA TruCare Pharmacy; (3) JP Morgan Chase bank account ending in 5623, held in the name of Advance Pharmacy LLC; and (4) JP Morgan Chase bank account ending in 2252, held in the name of Eclectic RX Consulting Inc.

55.     Investigators then traced all $53,840,532.28 of proceeds that were eventually transferred through and to various banks, personal, business and investment accounts, and real estate utilizing the Lowest Intermediate Balance Rule ("LIBR").

56.     LIBR is an accounting method used to trace commingled criminal proceeds.   The rule assumes the criminal subject spends "clean" money (funds not shown to be associated with crimes) prior to spending any criminally obtained funds.   In doing so, criminal proceeds "sink" to the bottom of the account and are generally the last funds used when there are withdrawals from the bank account.   If the account balance falls below the amount of criminal proceeds deposited into the account, then the amount of criminal proceeds sitting in the account is reduced to the amount of the low balance.   Financial investigators used the LIBR method, when applicable, when tracing criminal proceeds into and between the accounts described further below.

57.     The Defendant Properties each have a percentage of "fraud deposits" or "proceed deposits" associated with each account or asset, which corresponds to the proceeds of specified unlawful activities tied to each account or asset. Importantly, during the period analyzed, S. Simpson had no substantial source of legitimate income; furthermore, prior to the beginning of the fraud scheme, S. Simpson had *de minimis* account balances in all known accounts. Therefore, the fraud percentages assigned to each account/asset are a conservative floor, calculated through direct tracing of fraud proceeds. In reality, the fraud percentages approach 100% once layering between the accounts is accounted for, as virtually all sources of income in the S. Simpson financial ecosystem are fraud proceeds or come from assets/accounts obtained with fraud proceeds.

58.     Furthermore, even if the Defendant Properties were funded with non-proceeds,

money laundering forfeitures under 18 U.S.C. § 981(a)(1)(A) authorize the forfeiture of all property involved in money laundering transactions (even if some portion of the funds are "clean" or otherwise unidentifiable).

59.      In short, the financial investigation determined that businesses and banking activity of S. Simpson were permeated by fraud, kickbacks, and money laundering.

## **DEFENDANT FINANCIAL ACCOUNTS ARE SUBJECT TO FORFEITURE**

60.      The Defendant Financial Accounts reiterated below are all subject to forfeiture as they contain proceeds of the underlying fraud and kickback scheme and constitute property involved in money laundering.

| | **ACCOUNT HOLDER** | **REFERENCE NAME** | **ACCOUNT NO.** | **APPROXIMATE AMOUNT SEIZED IN US $** | **LIBR ATTRIBUTED PROCEEDS** |
|---|---|---|---|---|---|
| a. | Advance Pharmacy | **BBT 1** | x4717 | $386,110.38 | $386,022.38 |
| b. | TruCare Pharmacy | **BBT 2** | x7427 | $806,821.00 | $804,680.72 |
| c. | Shalondria Simpson | **JPMC Simpson Personal Checking** | x2204 | $15,196.24 | $14,948.76 |
| d. | Advance Pharmacy | **JPMC 1** | x5623 | $398,337.31 | $356,897.31 |
| e. | TruCare Pharmacy | **JPMC 2** | x2252 | $618,999.54 | $610,274.42 |
| f. | SRS Real Estate Investment | **JPMC SRS Real Estate** | x0729 | $22,026.23 | $8,033.40 |
| g. | Shalondria Simpson Revocable Trust | **JPMC Simpson Trust 1** | x1962 | $1,697,013.49 | $1,696,979.74 |
| h. | Shalondria Simpson | **JPMC Simpson** | x5077 | $231,827.75 | $231,827.75 |

| | Revocable Trust | **Trust 2** | | | |
|---|---|---|---|---|---|
| i. | Shalondria Simpson | **C. Schwab** | x3195 | $1,000,000.00 | $999,618.17 |

BBT 1

61.     **BBT 1** is listed on the DOL-OWCP Provider Enrollment Form as the business account listed to be utilized for direct deposits and reimbursements for Advance Pharmacy. An analysis of **BBT 1** conducted between June 2015 and September 2021 revealed 88% of all deposits are from DOL-OWCP.   Proceeds traced into **BBT 1** for that time period total $47,785,823.44.   This account served as the primary receiving account for proceeds from the fraud scheme deposited by DOL-OWCP.

BBT 2

62.     An analysis of **BBT 2** conducted between June 2018 and September 2021 revealed 90% of all deposits are from DOL-OWCP. Between June 2018 and September 2022, **BBT 2** received $9,777,652.66 from DOL-OWCP in traced proceeds. Additionally, on October 4, 2017, S. Simpson deposited a check into **BBT 2** in the amount of $100,000.00 from her personal checking account (**JPMC Simpson Personal).** On April 18, 2018, S. Simpson deposited an additional $100,000.00 into **BBT 2** from **BBT 1.**

JPMC 1

63.     Between October 2021 and July 31, 2022, **JPMC 1** received $1,643,522.51 from DOL-OWCP in traced proceeds via deposits. Analysis revealed 67% of all deposits between October 2021 and July 31, 2022 were from DOL-OWCP traced proceeds. Additionally, on October 1, 2019, S. Simpson deposited $40,000 into **JPMC 1** from account **BBT 1;** and again on January 12, 2021, S. Simpson deposited $50,000.00 into **JPMC 1** from **BBT 1.**

JPMC 2

64.     Between August 2021 and May 2022, **JPMC 2** received $1,106,086.43 from DOL-OWCP in traced proceeds via deposits. Analysis revealed between August 2021 and May 2022, 97% of all deposits into **JPMC 2** consisted of DOL-OWCP deposits.

JPMC Simpson Personal

65.     Between June 2015 and March 31, 2022, S. Simpson transferred a total of $7,566,043.00 via proceeds from **BBT 1.**   She also transferred a total of $770,000.00 from the **BBT 2** account. **JPMC Simpson Personal** was utilized to receive funds from various other accounts that S. Simpson operated, with fraud proceeds from the DOL-OWCP being the primary source of funds. Multiple Defendant Properties were purchased out of **JPMC Simpson Personal** utilizing proceeds from DOL-OWCP deposits. For example, **JPMC Simpson Personal** funded the following purchases (each of which constitutes at least one, if not several violations of 18 U.S.C. §§ 1956, 1957):

66.     In or around April/May 2017, **JPMC Simpson Personal** was used for a $756,587.25 transaction to purchase 1219 Oahu Dr., Tiki Island, TX 75554 utilizing fraud proceeds.

67.     On or around November 1, 2017, **JPMC Simpson Personal** was used for a $72,093.69 transaction to purchase a Jaguar (one of the Defendant vehicles) utilizing fraud proceeds.

68.     On or around November 17, 2017, **JPMC Simpson Personal** was used for a $134,679.47 transaction to purchase a Land Rover (one of the Defendant vehicles) utilizing fraud proceeds.

69.     In or around March 2018, **JPMC Simpson Personal** was used for a $1,008,648.28 transaction to purchase 2331 Nashville New Orleans, LA 70015, utilizing fraud proceeds.

70.     In or around September 2018, **JPMC Simpson Personal** was used for a $1,668,677.70 transaction to purchase 4028 Chatham Ln, Houston, TX 77027, utilizing fraud proceeds.

JPMC Simpson Trust 1

71.     On or around June 25, 2021, S. Simpson deposited $3,500,000.00 into **JPMC Simpson Trust 1** with the source of funds being proceeds from **BBT 2**.   That same date, S. Simpson also deposited $1,500,000.00 into **JPMC Simpson Trust 1** with the funds originating from proceeds contained in **BBT 1**.   As a result, **JPMC Simpson Trust 1** was completely funded by proceeds and all transaction originating from **JPMC Simpson Trust 1** contain proceeds.

72.     On or around November 2, 2021, S. Simpson made a payment to Patten Title Company from **JPMC Simpson Trust 1** in the amount of $2,061,622.83. This amount was revealed to be a purchase for a property (1.04-acre lot) located at 31 Riverstone Island Drive, Sugarland, TX 77479. This transaction was also funded with illegal proceeds.

73.     On or around November 17, 2021, S. Simpson transferred $221,000.00 into **JPMC Simpson Trust 1** from **JPMC 1**; on the same date, S. Simpson also transferred $120,000.00 into **JPMC Simpson Trust 1** from **JPMC 2**.

JPMC Simpson Trust 2

74.     On or around July 7, 2021, S. Simpson transferred $500,000.00 into **JPMC Simpson Trust 2** from **JPMC Simpson Trust 1**.   As a result, **JPMC Simpson Trust 2** was

25

completely funded by proceeds and all transaction originating from **JPMC Simpson Trust 2**
contain proceeds.

75.     On or around November 29, 2021, S. Simpson made a purchase from Legacy
Auto for a 2021 Jeep Grand Cherokee (a Defendant Vehicle) in the amount of $44,250.00
utilizing fraud proceeds from **JPMC Simpson Trust 2**.

76.     Simpson also transferred a total of $265,000.00 from **JPMC Simpson Trust 2** to
her personal account (**JPMC Simpson Personal**). These consisted of the following transactions:
$50,000.00 on August 30, 2021; $100,000.00 on November 17, 2021; $100,000.00 on January 4,
2022; and $15,000.00 on March 24, 2022; and $500,000.00 on May 17, 2022. Each of these
transactions consisted of fraud proceeds in violation of 18 U.S.C. §§ 1956, 1957.

JPMC SRS Real Estate

77.     This financial account was used to manage S. Simpson's real estate properties. On
February 24, 2021, S. Simpson transferred $100,000.00, via check #1047, from **BBT 2** to **JPMC
SRS Real Estate**. S. Simpson also transferred a total of $70,000.00 from **JPMC Simpson Trust
2** in two transactions: $60,000 on or around February 10, 2022; and $10,000 on or around March
2, 2022.

78.     Analysis showed that at least $64,176.00 was transferred back from **JPMC SRS
Real Estate** into **JPMC Simpson Personal** for her use. These transactions also constitute
violations of 18 U.S.C. § 1956, and for the transactions exceeding $10,000, violations of 18
U.S.C. § 1957.

C. Schwab

79.     On or around May 15, 2017, S. Simpson transferred $1,000,000.00 from **BBT 1**,
via check #1732, into **C. Schwab**, where the funds remained until they were seized. This

transaction constituted a violation of 18 U.S.C. §§ 1956, 1957, and comprises the funds of the

Defendant Financial Account seized from Charles Schwab.

80.     As a result, each of the Defendant Financial Accounts is subject to forfeiture, both

as proceeds of the underlying fraud scheme (as violations of 18 U.S.C. §§ 1341, 1343, 1347 and

1349), and as property involved in money laundering (as violations of 18 U.S.C. §§ 1956,1957).


## DEFENDANT REAL PROPERTIES ARE SUBJECT TO FORFEITURE

### 13405 Sunset Bay Ln, Pearland, TX 77584

81.     In or around June and July 2015, S. Simpson purchased a property at 13405

Sunset Bay Ln, Pearland, TX 77584. The purchase consisted of two transactions from **BBT 1** (an

account in the name of Advance Pharmacy): the first, a check for $52,108.59 consisted of

approximately $9,884.38 in illegal proceeds; the second, an internet payment of $102,107.59

consisted of approximately $101,567.60 of illegal proceeds.

82.     Therefore, this property is subject to forfeiture as it was purchased with illegal

proceeds, and the purchase also constituted violation of 18 U.S.C. §§ 1956, 1957.

### 1219 Oahu Dr, Tiki Island, TX 77554

83.     In or around April and May 2017, S. Simpson purchased real property at 1219 Oahu

Dr, Tiki Island, TX 77554.

84.     In order to effectuate that purchase, on or around April 25, 2017, S. Simpson moved

$800,000 (containing of approximately $778,999.89 in illegal proceeds) in a wire transfer from an

Advance Pharmacy Account (**BBT 1**) to her personal account **JPMC Simpson Personal**

**Checking.**

85.     On or around May 12, 2017, S. Simpson completed the transaction with a

$746,587.25 payment (containing approximately $705,369.80 in illegal proceeds) to Capital Title.

86.     Therefore, this property is subject to forfeiture as it was purchased with illegal proceeds, and the purchase also constituted violations of 18 U.S.C. §§ 1956, 1957.

2331 Nashville Ave New Orleans, LA 70015

87.     In and around February and March 2018, S. Simpson purchase real property at 2331 Nashville Ave New Orleans, LA 70015.

88.     In order to effectuate the transaction, S. Simpson wrote a check for $1,500,000 (containing approximately $1,487,482.95 in illegal proceeds) to herself from an Advance Pharmacy LLC account **(BBT 1).** The check was then deposited into **JPMC Simpson Personal Checking** on or around February 16, 2018.

89.     On or around March 9, 2018, S. Simpson completed the transaction with a $1,003,648.28 wire transfer (containing approximately $1,001,333.87 in illegal proceeds) to Bayou Title.

90.     Therefore, this property is subject to forfeiture as it was purchased with illegal proceeds, and the purchase also constituted violations of 18 U.S.C. §§ 1956, 1957.

4028 Chatham Ln, Houston, TX 77027

91.     In or around August and September 2018, S. Simpson purchased real property at 4028 Chatham Ln, Houston, TX 77027.

92.     In order to effectuate the purchase, S. Simpson transferred $2,400,000 (containing approximately $2,399,250.24 in illegal proceeds) from an Advance Pharmacy Account **(BBT 1)** to **JPMC Simpson Personal Checking,** on or around September 13, 2018.

93.     The transaction was completed the next day, September 14, 2018, when S. Simpson wired $1,668,677.70 (containing approximately $1,667,833.27) to Infinity Title Company.

94.     Therefore, this property is subject to forfeiture as it was purchased with illegal proceeds, and the purchase also constituted violations of 18 U.S.C. §§ 1956, 1957.

31 Riverstone Island Dr., Sugarland TX 77479

95.     In or around October and November 2021, S. Simpson purchased real property at 31 Riverstone Island Dr., Sugarland TX 77479.

96.     This purchase consisted of two transactions: on or around October 22, 2021, a $19,500.00 wire transfer (containing approximately $19,492.06 in illegal proceeds) from **JPMC Simpson Trust 2** to Patten Title Company via Texas Capital; and on or around November 2, 2021, a $2,061,622.83 wire transfer (containing approximately $2,061,062.70 in illegal proceeds) from **JPMC Simpson Trust 1** to Patten Title Company via Texas Capital.

97.     Therefore, this property is subject to forfeiture as it was purchased with illegal proceeds, and the purchase also constituted violation of 18 U.S.C. §§ 1956, 1957.

5213 Lillian St, Houston, TX 77007

98.     In or around June and July 2022, S. Simpson purchased real property at 5213 Lillian St, Houston, TX 77007.

99.     This purchase was primarily funded by a $595,925.76 wire transfer (containing approximately $433,861.12 in illegal proceeds), sent from **JPMC Simpson Trust 2** to Spark Title LLC.

100.    Therefore, this property is subject to forfeiture as it was purchased with illegal proceeds, and the purchase also constituted violation of 18 U.S.C. §§ 1956, 1957.

## **DEFENDANT VEHICLES ARE SUBJECT TO FORFEITURE**

101.    Additionally, each of the Defendant Vehicles was purchased with illegal proceeds generated by the underlying fraud scheme. Additionally, the purchase of each of the Defendant Vehicles constitutes at least one discrete violation of 18 U.S.C. § 1957, as each purchase utilized more than $10,000 in illegal proceeds.

Boat – 2017 Blue Wave 2200 Pure Bay
Serial No. PWV13872F617

102.    On or around October 23, 2017, S. Simpson made a $1,000.00 purchase (deposit) towards a boat (2017 Blue Wave 2200 Pure Bay) utilizing a card related to her **JPMC Simpson Personal** account.   The payment was made to North Texas Marine.   On or around October 23, 2017, S. Simpson utilized a cashier check in the amount of $64,813.73 to complete the purchase of the boat.   The funds for the $64,813.73 cashier's check came from **BBT 1**. The financial investigation determined that approximately $51,816.50 of the cashier's check purchase payment was directly traceable to fraud proceeds.

2016 Jaguar Vehicle
VIN: SAJWA2GE1GMW0206

103.    On or around November 1, 2017, S. Simpson purchased a 2017 Jaguar, using a wire transfer in the amount of $72,093.69 from her personal checking account, **JPMC Simpson Personal**. The financial investigation determined that approximately $71,891.89 of the purchase payment was directly traceable to fraud proceeds.

2017 Land Rover Vehicle
VIN: SALGS2FK6HA369005

104.    On or around November 17, 2017, S. Simpson purchased a 2017 Land Rover, via check # 1076, in the amount of $134,679.47.   This purchase was made utilizing funds from S.

Simpson's personal checking account, **JPMC Simpson Personal**. The financial investigation determined that approximately $128,750.31 of the purchase payment was directly traceable to fraud proceeds.

2018 Tesla 4dr SUV Vehicle
VIN: 5YJXCBE25JF104983

105.    On or around June 20, 2018, S. Simpson purchased a 2018 Tesla vehicle in the amount of $125,005.13. This purchase was made utilizing funds from S. Simpson's Advance Pharmacy business operating account, **BBT 1**.   An initial deposit of $2,500.00 was made previously for the Tesla on May 10, 2018, from an unknown account.   Total funds used to purchase the Tesla was determined to be $127,505.13. The financial investigation determined that the entirety of the $125,005.13 purchase payment was directly traceable to fraud proceeds.

2021 Jeep Grand Cherokee Vehicle
VIN: 1C4RJFAG2MC753861

106.    On or around November 29, 2021, S. Simpson purchased a 2021 Jeep Grand Cherokee vehicle in the amount of $44,250.00, via wire transfer. This purchase was made utilizing funds from **Simpson's** JP Morgan Chase Trust Account, **JPMC Simpson Trust 2**. The financial investigation determined that the entirety of the $44,250.00 purchase payment was directly traceable to fraud proceeds.

2021 Mercedes Vehicle G63 (purchased from Lamborghini of Houston)
VIN: W1NYC7HJ4MX415540

107.    On or around February 28, 2022, S. Simpson purchased a 2021 Mercedes G63 vehicle in the amount of $100,000.00, via wire transfer. This purchase was made utilizing funds from **JPMC 1**.   The financial investigation determined that approximately $99,214.92 of the purchase payment was directly traceable to fraud proceeds. Part of this purchase included a

$60,000.00 trade in of a previously owned 2014 Mercedes by S. Simpson, wherein of the $60,000.00, all were determined to be traced proceeds.

108.    In sum, each of the target vehicles is subject to forfeiture, both as proceeds of the underlying fraud scheme (generated by violations of 18 U.S.C. §§ 1341, 1343, 1347 and 1349), and as property involved in money laundering (specifically violations of 18 U.S.C. § 1957).

## <u>CONCLUSION</u>

109.    The Defendant Properties are all subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as the proceeds of violations of 18 U.S.C. §§ 371 (Conspiracy to Defraud the United States and Pay and Receive Kickbacks), 1035 (False Statements Relating to Healthcare Matters), 1343 (Wire Fraud), 1347 (Health Care Fraud), and 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud) and 42 U.S.C. § 1320a-7b(b) (the Anti-Kickback Statutes) as part of their scheme to defraud the Federal Employee Compensation Act ("FECA") program, administered by the U.S. Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP"), and other federal programs.

110.    The Defendant Properties are also all subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in violations of Title 18, United States Code, Sections 1956 (Laundering of monetary instruments) and 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) as part the money laundering scheme.

## NOTICE TO ANY POTENTIAL CLAIMANT

YOU ARE HEREBY NOTIFIED if you assert an interest in the property subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.   The verified claim must be filed no later than 35 days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

An answer or a motion under Fed. R.Civ.P. 12 must be filed no later than 21 days after filing the claim.   The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

**RELIEF REQUESTED**

  The United States will serve notice, along with a copy of the Complaint, on the property owner(s) and on persons who reasonably appear to be potential claimants.

  The United States seeks a final judgment forfeiting the Defendant Properties to the United States and requests any other relief to which the United States may be entitled.

        Respectfully submitted,

        ALAMDAR S. HAMDANI
        United States Attorney

        *s/Brandon L. Fyffe*
        Brandon L. Fyffe
        SDTX Federal No. 3698129
        Assistant United States Attorney
        1000 Louisiana, Suite 2300
        Houston, Texas 77002
        Telephone (713) 567-9000
        Fax: (713) 718-3300

**<u>VERIFICATION</u>**

I, Austin Denney, Special Agent with United States Postal Service – Office of the Inspector General, declare under the penalty of perjury, as provided by 28 U.S.C. ' 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture In Rem and Notice to Potential Claimants, and that the facts stated in the Complaint are based upon my personal knowledge, upon information obtained from other law enforcement personnel, or upon information I obtained in the course of my investigation.   Those facts are true and correct to the best of my knowledge and belief.

Executed on the 26th day of June, 2023.

Austin Denney
Special Agent
USPS - OIG